Good morning. To please the court, my name is John Scott. I represent the appellant and the plaintiff, Janeth Glenn-Davis. I did receive the order of the court asking for counsel to be prepared to discuss the McGinnis v. GTE case, and I have read that case several times and am prepared to discuss the case. I'd like to begin by saying that the case does seem to stand for at least three significant propositions, as I read it, that relate to this case. The first being that circumstantial evidence can be given as much weight, if not more weight, than direct evidence, and that in cases where intent is at issue, the courts, especially in summary judgment, should be willing and able and are directed to draw inferences in favor of the non-moving party and to draw inferences from circumstantial evidence in favor of the non-moving party. And there's a number, there's a lot of evidence in this case I'd like to address from which we believe there's circumstantial evidence that addresses really two main issues, and those seem to be the two punch lines that McGinnis gets to. And that is, number one, is there evidence or are there factors upon which cast doubt on the proffered explanation of a freeze as being the reason for not promoting? And number two, has additional evidence been provided to support the contention that there was discrimination in this case? And I'd like to address both of those issues, starting with the freeze issue. The freeze really comes up for the first time, at least the term freeze, is not used until this lawsuit is filed and until we get to summary judgment. Prior to that time, in letters and in conversations and in whatever writings, limited writings that did exist from the city and city decision makers, the term freeze was never used. When we get to summary as attempting to explain and articulate why my client was not promoted, and a careful reading of his declaration, which is excerpts of the record, pages 58 through approximately 63. Number one, his argument about the freeze is based on what is very disputed. He says in his declaration that it was in early 2001 that he and the chief of police and the city manager and others were examining the existing structure and reorganization of the Oakland Police Department. He later says in his declaration that during 2001, there was discussions about creating a PSA, a police service area, with the inference being that during 2001, the issue had not been resolved, that it was still up in the air, were they going to have a reorganization, and was this reorganization going to include a police service area? Well, this was directly disputed by my client's declaration, and defendants have not her contention, and it's also supported by the declaration of the expert Elizabeth Watson at page 540 of the excerpts. But in her declaration, she states that this reorganization into a PSA, that those conversations and those meetings and plans started in 1999, was essentially completed by 2000. As of January 2001, the reorganization was completed. It wasn't something that was in the discussion phase or something that was in a phase of are we going to implement it and how are we going to implement it? By January 2001, the reorganization had to act in captain in January 2001 in area 2. Was anybody promoted during the so-called hiring freeze? Well, it depends when you, if there was a freeze and when it occurred. The problem with talking about the freeze is that Mr. Musgrove contends in his declaration that the freeze began in the late summer of 2001. Chief Ward in his deposition, and this is at page 399 of the excerpts of the record, Chief Ward testified the freeze didn't start until December 2001 and was intended to end at the end of the fiscal year, which would have been July 1st, 2002. So that's another issue that's come up. Was anybody promoted during that period? Either of those periods? Yes. Who was promoted? Well, during 2001, it's in my client's declaration, the sergeants and lieutenants were promoted. I'm talking about lieutenants to captains. There were no promotions to captain during 2001, but there was during that fiscal year. And if you look at Chief Ward's deposition and he says he understood the freeze was supposed to be in effect from December 2001 to July 2002, which would be the end of the fiscal year, from the new list, Lieutenant Jeff Israel was promoted to captain in May of 2002. That's after the new list came out and everything? Yes. But again, the point is we have a contradiction between two key players in this and two defendants as to when the firing freeze began and not only when it began, why it began. I'm not clear as to your answer to Judge Silverman. Does it matter when it began in terms of was anyone appointed, either the earlier date or the later date? Well, no. No one was promoted to captain during that period of time. But the point is what's in dispute is whether the so-called freeze is a total fabrication. And our position is that the freeze was a total fabrication and that the same reasons the Court of McGuinness found that it appeared protectual and suspect on its face, the same reasons we even have more evidence in this case why the freeze should be considered to be protectual and suspect and really a tribal issue of fact, was there really a freeze at all? What difference does it make, what we call it, if during that time no male and no female was appointed? Well, the issue becomes if you draw inferences in her favor and she has said in her declaration that she was told by the chief that he intended to promote her from the list as soon as Captain Hare retired, she was in the acting captain and during from January to August of 2001, she was filling that position and being paid as a captain, which undercuts any kind of budget argument they're trying to make. She was in the position being paid as a captain. The chief told her he intended to promote her as soon as Captain Hare retired. Captain Hare retires and no promotions are made and the only excuses or rationale they can come up with after the fact are shifting explanations. It was the budget, we were working on this PS, which we know is false, it wasn't a budget reason, at least we introduced evidence to dispute that to show it's protectual. The next argument that we were debating whether we needed captains positions or which we've shown is protectual because captains positions were available during that time and they never eliminated any and the PSA had already been implemented long before August, September of 2001. So on the one hand, yes, no promotions were made during that period of time. The question becomes of either males or females. That's correct, but in the year 2000, two males were promoted in September 2000. They were higher on the list than she was, right? Yes, that's true. They were in the group of five but they had two and three positions. Yes, they were within the rule of five. Number one on the list was not promoted. The men who were two and three were. She could have been promoted. She was reachable for promotion in September 2000. The point I was trying to make is if this so-called reorganization that Mr. Musgrove was talking about, Dr. Musgrove was talking about, was a reason that they were questioning because of this reorganization and the PSA plan going into effect was a reason to question are we going to eliminate captains positions or should we promote more captains, then we know that was happening in 2000. The year 2000 is when they were actually beginning to implement the PSA and to implement the reorganization. It had already been done by 2001. So if that was in fact a legitimate reason for them not to promote any captains or if they were not going to promote captains because they were considering eliminating captains, then why did they promote two men in September 2000? At the end of the day, what we have here is before this list, during this list, and after this list, the Oakland Police Department had nine slotted positions for captains that were fully budgeted during the entire period of the time. And to suggest that they were trying to, this was about creating a new position, this was never about are we going to create a new captain position. It was always about filling positions that were budgeted. This position that opened up when Captain Hare retired in August of 2001 was budgeted, was an existing position. It wasn't a new position. In the normal course of business, it would have been and should have been filled immediately. And we have evidence from the plaintiff that she was told not only by the chief that he intended to promote her, but her declaration indicates that Mr. Musgrove was aware of it and had signed off on it, quote unquote. Thank you very much, Mr. Scott. We'll give you a minute in rebuttal. Good morning. Marion, would you put 10 minutes on the calendar, please? We've shortened the time to 10 minutes. Hang on a sec. Here you go. Good morning. Good morning. May it please the court, my name is Rachel Wagner. I represent the city of Oakland and the individual defendants in this case, including Police Chief Richard Ward. I did also receive the court's request to discuss McGinnis. I'd like to back up for one moment. McGinnis did not change the law, not the law of the Supreme Court or the law of this circuit. And that law is very clear. That is that once the burden of production is met by the city of Oakland, and we submit it was more than met, that there was a What's the legitimate reason? A freeze? You can call it a freeze or a refusal to promote. Musgrove and Bob and Ward are all consistent that Musgrove and Bob refused to promote anyone to that position. And furthermore, Glenn Davis, according to her own testimony, was informed of that fact as early as August of 2001 by her supervisor, Deputy Chief Dunbar. She didn't just hear it from Chief Ward. And what struck me when I reviewed the record was that Glenn Davis herself was hearing the information that the captain's position was in controversy, that there might be elimination of captain's positions, and that there was discussion that they weren't needed. She heard it from Deputy Chief Dunbar at meetings because he was her direct supervisor. She heard discussion among other lieutenants and captains. She heard it from Chief Ward on October 27th and again on October 28th. The phrase that Chief Ward said was, they will not allow me to promote into the position. The phrase that Chief Dunbar used was, they are not allowing any captains' promotions. Is there any written documentation of this? Or is it all word of mouth? There isn't any written documentation of this, and that's for a good reason. This is not... Well, I mean, there may be a good reason, but doesn't the McGuinness... Let's go to McGuinness. Doesn't that say, you know, if there's no documentation, you have a trial issue about whether it's a good reason or not? I don't think that's what McGuinness said. McGuinness looked at a combination of factors, Your Honor. McGuinness first looked at the absence of documentation about a freeze that even the manager didn't know about, that even the person entering the position didn't know about, that no one knew about until that particular man's name was submitted, and then looked at a years-long string of taunts, terrible racial incidents, in combination with that, and specifically and expressly said, this combination of factors, GTE's permissive response to extreme racial insults and taunts, shows the discriminatory motive. And that's at 1123 and 1124 McGuinness. When they talk about the absence of document, they cite back to Reeves, a Supreme Court case that said you may, you may find a pretext not credible in the absence of documentation. But Reeves goes on to say that if the employee creates only a weak issue of fact, doesn't come forth with specific and substantial evidence, and there's undisputed evidence of this reason, that the employee will not survive a summary judgment motion. The danger of McGuinness is this. A perfect analogy is a law firm where a named partner has a veto and says we're in the middle of restructuring equity, non-equity partners, we're not going to make any partners this year. There's five people up for partner. One of them is a woman. The named partner doesn't know and doesn't care. The edict has come out. It's never in writing, or not usually. Politics and personnel decisions at this level, the refusal to sign off on something does not need to be in writing to be credible. Are you saying McGuinness is wrong? No. I'm saying that McGuinness had a combination of factors, had discriminatory motives shown through pages and pages, years and years of incidents to which other witnesses testified as well regarding Reeves. I think that McGuinness should be limited to its facts. I think the dissent was very powerful in pointing out the danger that, in fact, what can happen is the burden of persuasion is shifting to the defendant. It is not a burden of production. It's not as simple as here are our witnesses, here is the testimony, here is the evidence, and some of it here, much of it here is from Glenn Davis herself. She heard about this freeze for months. Whether it was called they won't promote anyone, they're blocking it, they may eliminate the position, she heard about it. She didn't hear anything that was gender-related, they don't want to promote you. She didn't bring forth any specific or substantial evidence that it was based on a discriminatory motive, but to then turn and say, well, the city or the company could have done more, could have put forth a different kind of evidence is to change the burden of persuasion entirely. I don't think McGuinness intended to do that. I think McGuinness was struck by the facts with which that court was presented and found the discriminatory motive in the long and, frankly, horrible history of that employee-employee relationship. Plaintiff also says that the city had varying reasons why she didn't get promoted. How do you answer that? They are a pretext. Indeed. And, in fact, at page four of their reply brief, they list four reasons which, if you look at them carefully, are all the same and are outlined in both what Ward said to her and the letter that Robert Bob sent to her before litigation ever started. And that is that no, and Robert Bob said this in the letter that was sent to her, that no promotion to captain was authorized by his office during that period, despite the fact the department lobbied for it. That's right in the letter. And in terms of the budget concerns, it's unequivocal, both in his deposition testimony and Musgrove's declaration, undisputed that their idea was if we have to staff a lot of lieutenants for these PSAs, and they're going to be in command of the PSAs, why do we need so many captains? Why are we so top-heavy? Why not take that budgeted position and use that money to fund sergeants and lieutenants who were indeed promoted during this same period? Why do we need a captain over Area 2, that was his position, if we're going to have seven PSAs headed by lieutenants? The two promotions that did occur over a year earlier, in September 2000, did not involve the geographic areas 1, 2, or 3. They involved youth and community services. It's this particular position over Area 2, for which five candidates are still eligible. None of them got a promotion to captain. None of them got into the Area 2 position. And that list, according to the MOU, had to expire, did expire on January 2nd. Both Chief Ward and Glenn Davis, in their 17 and 18 years with the police department, have never heard of a list being extended. We'd be hearing on a different lawsuit if a list was arbitrarily extended in contravention of the MOU. That's the cycle. And during this particular cycle, the reorganization was not complete. Respected counsel cited to Betsy Watson's declaration, which is all of four paragraphs. She's a consultant. Consultant of the police department. Well, did she say that she didn't recommend that? She said she didn't discuss. She didn't discuss the elimination of captain's positions at all, nor did she discuss Glenn Davis with them. She discussed PSAs and the need for lieutenants to head them up. And as a consequence of that, the city manager is saying, where is that money going to come from? And Musgrove is saying, why do you need so many captains? Move someone else into that position who's already a captain. You've got nine of them. What I was going to point out, though, is that that consultant, and the record is at 540 and 541, says that she was consulting with the city of Oakland on the reorganization in 1999, 2000, and 2001. Her declaration provides absolutely no support for the idea that this was over or done. They were in the middle of figuring out this reorganization and how to take areas one, two, and three, the traditional setup with three traditional captains, and combine it with seven new PSAs headed by lieutenants. But this position was filled right soon after the next exam, right? It was filled in May 2002, about five months after the exam. The exam was in January. And she didn't pass that or didn't get in the top five? She did pass it, Your Honor. But it's true, she didn't make top five. She didn't get in the top five. And there was no way to know where she would land or anyone else. In fact, the gentleman who the luck of the draw, if you will, people are known to die on the list, as Glenn Davis has admitted in her deposition all the time. It's a matter of where you are and what's going on. In terms of what was going on in 2002, both Musgrove and Bob are clear that Chief Ward, who championed Glenn Davis, who wanted this position filled all along, came back armed with crime statistics. This time he's saying, there's an increase in crime in this area, too, I have a problem with span of control, I need a captain there. He attached those crime statistics, it's part of the record, it's Exhibit 4 to his declaration. And on that basis, Bob said, well, okay, you can have your captain. Musgrove still objected to the entire idea. The point here is it was never a personal decision, it was a personnel and political decision. And that's what Glenn Davis finds hard to accept. But that's the truth. Thank you, Ms. Wagner. Marion, would you put one minute on the clock? Thank you, Your Honor. This may have been a political and personnel decision, and the fact is that oftentimes, unfortunately, political and personnel decisions can be discriminatory. In the McGinnis case, it says very clearly, quote, nothing compels the parties to invoke the McDonnell-Douglas presumption. It goes on to say that the plaintiff, in that case, could proceed using the McDonnell-Douglas framework or alternatively, by simply producing direct or circumstantial evidence demonstrating a discriminatory reason more likely than not does kind of change the paradigm. And to the extent this court or the lower court in this case felt that somehow McDonnell-Douglas framework required plaintiff to somehow put in direct evidence to show pretext is just not the approach under McGinnis. I would like to say there's a best evidence rule for a reason, and although that really has been mentioned here, and the defendants talk about, well, you know, it was the budget or it was this reorganization, there's no documents. They've submitted absolutely no documents, and it brings to mind what I suggest is similar to little Johnny who comes to school and he doesn't have his homework, and the teacher says, well, Johnny, where's your homework? Oh, jeez, well, I left it at my grandmother's house. Well, you know, bring it in tomorrow. Johnny shows up tomorrow. Teacher says, Johnny, where's your homework? And he says, oh, the dog ate it. Well, how do you prove the dog didn't eat it? But simply because I can't prove the dog didn't eat the homework doesn't mean I don't have a tribal issue of fact to at least get to a jury, should we believe little Johnny when he said the dog ate it? And that's exactly what's happening in this case. And the best evidence in that case would be, well, how about a picture of the dog eating it? Or how about something documenting or another witness who saw the dog eat it? How about something? In this case, it's all take my word for it. They can just make it up as they go along, and because I can't prove that the dog didn't eat the homework, I don't have a tribal issue of fact to go to a jury. I submit that we have submitted substantial evidence, and not only that the tribal freeze pretext is, but look at the record here of how they treated her before she told them that she was pregnant and she planned on taking a pregnancy leave of several months and how she was treated afterwards. The dog ate your time. Thank you, Mr. Scott. Ms. Wagner, thank you very much. The case just argued is submitted. The next case, the last one to be argued is 0316173, Mondaro v. Salt River Project. Merritt, we're going to put ten minutes on the clock. Good morning, Your Honor. May it please the Court. I'd like to reserve a couple of minutes
judges: Alarcon, Siler , Silverman